A94A1738. HINTON v. THE STATE.

(452 SE2d 519)

ANDREWS, Judge.

Hinton, a/k/a Rico Cobb, appeals from his conviction of aggravated assault, kidnapping, and rape, arising from incidents occurring on November 14, 1992.

Viewed in favor of the verdict, the evidence was that, in 1991, G. W. was a student at a local university who regularly left her infant son with a child care provider who lived on Hinton's street. Hinton, who was otherwise unemployed, was renovating a house on that street. During this period, as G. W. walked past the house and waited at a nearby bus stop, she and Hinton would engage in casual conversation. They began dating in February 1992 and engaged in consensual sexual relations beginning in March 1992.

Hinton began striking G. W. in March, but would always apologize afterwards. In the summer, he beat her after she refused to tell him how much she had spent to have her hair braided. Hinton also dictated what type of clothing and makeup G. W. could wear and became more domineering.

In September, G. W. began to notice money missing from places where only she and Hinton knew it was located. When she mentioned this to him, Hinton threatened to beat her and she falsely accused someone else. Thereafter, Hinton wanted to borrow $100 and she told him if he did not pay it back in one week, she considered the relationship over. Although Hinton agreed to repay the money in one week, he told her that nobody was going to break them up. When Hinton did not repay the money, G. W. believed the relationship was over.

Hinton then told her he was spending the money on drugs, although at trial he said he was gambling but believed she would be more sympathetic if she believed he used drugs.

Shortly thereafter, Hinton called to G. W. as she and her child were going to the bus stop and asked her to talk to him. She went to the steps on his house and he began accusing her of telling people "his business." He screamed and cursed at her. Because a neighbor was outside, Hinton told her to go inside. She picked up her child, but Hinton would not allow her to bring the child in. Hinton then took her in his bedroom and forced her to have sex.

She did not report this incident for fear Hinton would harm her child or her mother, with whom she lived. Hinton began following her as she came to leave and pick up her child and on her way to school.

The college homecoming parade was October 31 and Hinton showed up and accompanied G. W. and a friend and their children. When G. W. refused to go home with him, Hinton popped balloons she had bought for her son. He then followed her as she walked home and grabbed the house keys and ran when she told him to leave.

Hinton continued to call and on November 13, he called and she told him not to call or come by anymore. Hinton became upset but she hung up on him because, the next day, she was supposed to take an exam required for her graduation. Saturday morning, she left her son with her mother and went to catch the bus about 7:40 a.m. to go to the exam. Hinton came out from behind a tree as the bus approached and told her she better not get on, if she did, "I'm going to shoot you." He opened his jacket and displayed a 9 mm handgun which he pulled out and loaded. She did not get on the bus and Hinton told her to walk. She thought he was going to walk her to the school, but as they approached the campus, he told her she was not going and forced her to walk several blocks to his house.

He and she sat on the steps for several hours and he apologized for the October incident, which he blamed on drugs. Eventually, Hinton calmed down, removed the clip from the gun, put the clip in his pocket, and gave her the gun. G. W. wanted to go home and they began to walk. He took her into a store, where he said he wanted to buy her something. G. W. realized Hinton was not going to let her leave. She walked out of the store and he followed her, asking if he could call or come by. She said no and Hinton requested the gun back. She gave it to him and turned to walk away when he slipped the clip back in the gun and told her to come with him. While she thought about running, she did not because of a heart murmur.

After going into his house, Hinton padlocked the door, and told her to remove her clothes. When she hesitated, he told her he would "shoot the s—t" out of her. She got into bed and Hinton threatened her again and ordered her to perform sodomy on him, which she

would not do. He then put his penis in her vagina against her will.

After committing the assault, Hinton again became pleasant and allowed her to go home. He walked with her there.

The next morning, Ross, G. W.'s niece, called G. W. and G. W. told her that Hinton had pulled a gun on her while she was waiting for the bus and wanted her to perform oral sex. On the morning of the test, G. W. was supposed to meet Tyson and go to the test with her. The next day, G. W. told her Hinton had a weapon, forced her to his home and made her have sex. Goodman, another student, was also called by G. W. the next day and told that Hinton forced her to his home and hurt her.

G. W. did not report the incident for fear that Hinton would injure her son or her mother. Hinton began calling and stalking G. W. again and, on November 24, he met her at the bus stop and wanted to know why she could not forgive him and why she was treating him this way. He wanted to walk and they walked toward the campus where she worked part time. While walking down the street, Hinton exhibited a knife. She alerted a campus police officer and told him Hinton threatened her. She ran into a building and the officer told Hinton to leave the campus. G. W. then told the dean of student activities, another administrator, and a counselor about the threats and prior rape. The police were contacted and this prosecution ensued.

Hinton continued to call G. W. who told her counselor, Garrett. Garrett suggested that when Hinton called, G. W. should call her on her three-way calling system and she would assist her in dealing with him. On December 13, G. W. did so and the three of them spoke. G. W. told Hinton to tell Garrett what he had done to her. Hinton said "Ms. Garrett, she think I raped her. I didn't know I raped her until I read those pamphlets in your office. She say I raped her. I would never hurt her." When asked about the knife and gun, Hinton said the gun was a rusty revolver he found during the renovations which would not fire and that, on the 24th, G. W. would not follow him, although he denied displaying the knife. Hinton said if G. W. would drop the charges, he would not bother her again.

1. During Garrett's testimony, the State tendered into evidence Exhibits 11, 13, and 14, three of the pamphlets which were displayed in Garrett's office. The pamphlets concerned "date rape" and various misconceptions concerning rape. They quoted sources such as Ms. Magazine and a report by the National Clearing House on marital and date rape. Hinton's second enumeration contends it was error to admit them because they were hearsay and that the court erred in charging the jury on their use.

Hinton has improperly included two claimed errors in the same enumeration of error. *Robinson v. State*, 200 Ga. App. 515, 518 (2b) (408 SE2d 820) (1991). We will consider the admission of the docu-

ments, although not required to. Id. The second argument is deemed abandoned.[1]

With regard to the admissibility of the documents, as stated by the State and instructed by the court, the documents were not entered to prove their truth and, therefore, were not hearsay. *Hurston v. State*, 194 Ga. App. 226 (390 SE2d 119) (1990). Further, even if considered hearsay, the subject of the documents was brought up by Hinton and they were merely being used to explain his statement and prior conduct. See *Dover v. State*, 250 Ga. 209, 212 (5) (296 SE2d 710) (1982); *Berryhill v. State*, 235 Ga. 549, 551 (6) (221 SE2d 185) (1975).

2. The first enumeration is that the court erred in not giving a charge on circumstantial evidence upon Hinton's written Request No. 11 to charge the language of OCGA § 24-4-6. Although the court indicated during the charge conference that a charge on that section would be given and the State acquiesced in such a charge, it was not given to the jury. Such a failure is error. *Mims v. State*, 264 Ga. 271 (443 SE2d 845) (1994); *Barner v. State*, 263 Ga. 365, 366 (1) (434 SE2d 484) (1993); *Postell v. State*, 261 Ga. 842 (412 SE2d 831) (1992).

However, it was harmless error as it is highly probable that the error did not contribute to the jury's verdict, given that the evidence against Hinton was overwhelming and given that his testimony offered no reasonable hypothesis to contradict the direct testimony of the victim. *Alexander v. State*, 263 Ga. 474, 476, 478 (2b, d) (435 SE2d 187) (1993); *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976); *Roura v. State*, 214 Ga. App. 43 (447 SE2d 52) (1994); *Manning v. State*, 207 Ga. App. 181, 182 (2) (427 SE2d 521) (1993); *Rash v. State*, 207 Ga. App. 585, 587 (5) (428 SE2d 799) (1993).

*Judgment affirmed. Pope, C. J., Birdsong, P. J., Johnson, Blackburn and Smith, JJ., concur. McMurray, P. J., Beasley, P. J., and Ruffin, J., concur specially.*

BEASLEY, Presiding Judge, concurring specially.

I concur fully in Division 1 but not entirely in Division 2. I do not join in the holding that the failure to give the charge was error.

The charge was not adjusted to the evidence. First, the jury could not possibly have convicted defendant on circumstantial evidence; it could either accept the victim's direct evidence or it would have to reject guilt altogether. It would be totally inconsistent to reject her testimony and find defendant guilty on the circumstantial evidence

---

[1] Even if properly enumerated, however, we note that it would be meritless since the court did instruct the jury on the limited purpose of the evidence when it was tendered and Hinton did not request additional instruction. *Thomas v. State*, 199 Ga. App. 49, 50 (4) (404 SE2d 315) (1991).

presented. The jury simply could not be in a position of having to be "familiar with how to weigh that circumstantial evidence." *Mims v. State*, 264 Ga. 271, 272 (443 SE2d 845) (1994).

Second, defendant offered no other reasonable hypothesis, as the majority recognizes. His defense was that he was not even in the victim's presence during at least part of the time the alleged crimes occurred. He and his friend testified that they met around 10:15 a.m. and drove to Newnan to a car auction, for which there was television advertising all week. They went to look for a car for the friend, who had neither a job nor a driver's license. Witnesses from two auctions testified that they held no car auctions on that day and knew of no other possible agencies or persons holding car auctions in the Newnan area on that day. This defense not only was not a reasonable hypothesis, it was none at all.

Thus a charge on the law contained in OCGA § 24-4-6 was not needed for a determination of guilt or innocence in this case.

I am authorized to state that Presiding Judge McMurray and Judge Ruffin join in this special concurrence.

DECIDED NOVEMBER 29, 1994 —
RECONSIDERATION DENIED DECEMBER 19, 1994.

*Michael A. Barkin,* for appellant.
*Lewis R. Slaton, District Attorney, Leonora Grant, Vivian D. Hoard, Assistant District Attorneys,* for appellee.